**ALABAMA POWER COMPANY, Petitioner,**

v.

**NUCLEAR REGULATORY COMMISSION and The United States of America, Respondents.**

**Nos. 81–7547, 81–7580 and 81–7846.**

United States Court of Appeals, Eleventh Circuit.

Dec. 6, 1982.

Rehearing and Rehearing En Banc Denied Jan. 31, 1983.

Troutman, Sanders, Lockerman & Ashmore, Robert H. Forry, Atlanta, Ga., Balch, Bingham, Baker, Hawthorne, Williams & Ward, S. Eason Balch, Sr., Robert A. Buettner, Albert L. Jordan, Birmingham, Ala., Winthrop, Stimson, Putnam & Roberts, Terence H. Benbow, New York City, for petitioner.

Frederic Freilicher, Robert J. Wiggers, Barry Grossman, Attys., Anti-trust Div., Dept. of Justice, Washington, D.C., for the Dept. of Justice.

Marjorie S. Nordlinger, Michael B. Blume, Attys., James A. Fitzgerald, Asst. Gen. Counsel, N.R.C., Washington, D.C., for the N.R.C.

Goldberg, Fieldman & Letham, Washington, D.C., David C. Hjelmfelt, Fort Collins, Colo., for Municipal Elec. Utility Ass'n of Ala.

Lowenstein, Newman, Reis & Axelrad, J.A. Bouknight, Jr., Washington, D.C., for Edison Elec. Inst.

Volpe, Boskey & Lyons, D. Biard MacGuineas, Bennett Boskey, Washington D.C., for Ala. Elec. Co-op., Inc.

Petitions for Review of an Order of the Nuclear Regulatory Commission.

Before HILL and FAY, Circuit Judges, and MORGAN, Senior Circuit Judge.

FAY, Circuit Judge:

This is an appeal by the Alabama Power Company (Alabama Power) from a decision by the Atomic Safety and Licensing Appeal Board (Appeal Board) of the Nuclear Regulatory Commission imposing certain conditions on the issuance of an operating license to Alabama Power for the Joseph M. Farley Nuclear Plant, Units 1 and 2. The Appeal Board found that the unconditional licensing of these nuclear plants would create or

maintain a situation inconsistent with the antitrust laws and their underlying policies and, pursuant to Section 105(c) of the Atomic Energy Act of 1954, 42 U.S.C. § 2135(c) as amended 1979, ordered relief in the form of ownership access to the plants and access to Alabama Power's transmission facilities. After review of the record, the decision of the Appeal Board, and the Atomic Energy Act and its legislative history, we affirm the ordered conditions.

I. Background.

The Alabama Power Company is a wholly-owned subsidiary of the Southern Company, a public utility holding company that also owns Georgia Power Company, Gulf Power Company (which operates in the Florida panhandle), and Mississippi Power Company, all of which function under an interchange contract as the Southern Company Pool. Alabama Power generates, transmits and distributes electricity in all of Alabama except the eleven northernmost counties which are served by the Tennessee Valley Authority. Alabama Power gives retail service to residential, commercial and industrial customers. Alabama Power gives wholesale electricity service to sixteen municipalities with their own distribution systems (twelve of which comprise the membership of the intervenor Municipal Electric Utility Association of Alabama [MEUA]). Alabama Power also sells wholesale electricity to eleven rural distribution cooperatives, (ten of which are members of the other intervenor, Alabama Electric Cooperative [AEC]), and to AEC itself. AEC, in turn, is a generation and transmission cooperative whose membership is made up of four municipalities, two industrial mills and fourteen rural cooperatives. Neither the MEUA nor its members had generating capacity at the time of trial. AEC had a 137 megawatt production capacity and Alabama Power had over a 6,000 megawatt capacity.

The statutory foundation for this case is Section 105 of the Atomic Energy Act. By amending this Act in 1970, Congress gave the Nuclear Regulatory Commission (NRC) added duties in connection with the licensing of nuclear power plants. Specifically, the NRC was charged with considering the antitrust ramifications of its licensing actions. Section 105(c) directs the NRC to review applications for permits to construct commercial nuclear power facilities to determine if the activities sought to be licensed would "create or maintain a situation inconsistent with the antitrust laws." 15 U.S.C. § 2135(c). The antitrust laws incorporated in Section 105(c)(5) are the Sherman Act, 15 U.S.C. §§ 1–7; the Wilson Tariff Act, 15 U.S.C. §§ 8–11; the Clayton Act, 15 U.S.C. §§ 12–27; and the Federal Trade Commission Act, 15 U.S.C. §§ 41–49. Under Section 105(c)(6) of the Atomic Energy Act, the NRC may rescind or refuse to issue a license if this result would follow. It may also attach appropriate conditions to a license to rectify the anticompetitive consequences of the licensed activity.

On October 10, 1969, Alabama Power Company filed with the Atomic Energy Commission, pursuant to Section 104 of the Atomic Energy Act, an application for a construction permit for a nuclear generating facility to be located in Houston County, Alabama. On June 26, 1970, Alabama Power filed an amendment to its application which requested authority to construct and operate a second, identical nuclear generating facility at the same location. These proposed nuclear facilities were originally designated the Southeast Alabama Nuclear Plant, but later were renamed the Joseph M. Farley Nuclear Plants, Units 1 and 2.

In December 1970, the Atomic Energy Act was amended by Congress to include a procedure whereby the Department of Justice is to notify the NRC if it determines that a prospective grant of a nuclear plant operating license might create or maintain a situation inconsistent with the antitrust laws. 42 U.S.C. § 2135(c)(1). Pursuant to this section, the Department of Justice advised the NRC, in a letter dated August 16, 1971, that a hearing should be held to consider whether the activities of Alabama Power, under the license for the Joseph M. Farley Nuclear Plant, would have adverse antitrust ramifications.

In accordance with procedures set forth in 42 U.S.C. § 2135(c)(3), the NRC gave notice that petitions for leave to intervene and requests for a hearing on the antitrust

aspects of the application for the Joseph M. Farley Nuclear Plant should be filed within thirty days. Within this period, the AEC petitioned for leave to intervene in connection with these applications and requested a hearing. Also within the period the MEUA petitioned for leave to intervene and requested a hearing. Despite opposition from Alabama Power, the petitions to intervene and motions requesting hearings were granted.

During the course of the proceeding, the former Atomic Energy Commission, on August 15, 1972, issued construction permits for the Farley Nuclear Plant, Units 1 and 2. These permits were issued subject to the outcome of the antitrust proceeding and stated that they were granted without prejudice to any subsequent licensing action, including the imposition of appropriate conditions by the NRC.

The Licensing Board of the NRC conducted an extensive hearing beginning in December, 1974. Alabama Power, AEC, MEUA, the Department of Justice, and the staff of the NRC all participated in and made presentations at these hearings. The final evidentiary session was held in April, 1976. Thereafter, all above parties filed proposed findings of fact and conclusions of law and reply findings. Oral argument was heard in November, 1976. The scope of these hearings was very broad, and evidence was heard of alleged anticompetitive conduct on the part of Alabama Power occuring many years, even decades, prior to its 1969 license application. Of the numerous allegations of anticompetitive conduct, the Licensing Board found only five to be meritorious. It found that only the product market for wholesale power was relevant and that Alabama Power possessed monopoly power in this market. It rejected the contentions of Alabama Power's opponents that there were relevant markets in either the retail power or coordination services areas. 5 NRC at 879–894.

The five instances in which Alabama Power was found to have acted in an anti-competitive manner were as follows: (1) Alabama Power engaged in "unfair methods of competition" by its threats to terminate service to AEC should AEC successfully compete to replace Alabama Power as a supplier to Fort Rucker in Alabama, 5 NRC at 942–45; (2) certain contract provisions between Alabama Power and AEC and the municipal distributors were anticompetitive in regard to precluding alternate sources of supply, 5 NRC at 931–32; (3) part of a 1970 contract between Alabama Power and the Southeast Power Administration was an exclusive dealing arrangement and anticompetitive in nature and effect, 5 NRC at 937; (4) between 1968 and 1972 Alabama Power refused to offer fair interconnection and coordination with AEC constituting anti-competitive conduct inconsistent with the antitrust laws, 5 NRC at 925; and (5) in the mid and late 1960's Alabama Power precluded small utilities, including AEC and municipal distributors, from regional economic coordination, 5 NRC at 946.

The Licensing Board found these examples of Alabama Power's anticompetitive conduct to have resulted in a situation inconsistent with the antitrust laws. It further concluded that activities under the nuclear license would maintain that situation. To remedy the antitrust concerns the Licensing Board imposed certain conditions on Alabama Power's license. Most importantly, it allowed AEC to purchase unit power from Alabama Power.

All parties appealed the Licensing Board's order to the Atomic Safety and Licensing Appeal Board of the NRC. The Appeal Board affirmed most of the Licensing Board's findings but made some additional findings. Principally, the Appeal Board found that two additional markets were relevant and that Alabama Power had wrongly wielded monopoly power in both. These two markets were the retail power market and the coordination services market.[1] The Appeal Board also found two additional instances in which Alabama Power had acted in an anticompetitive manner.

1. Coordination services include "various arrangements among utilities for reserve sharing, emergency exchange of power and energy, economy exchange of power and energy, main-tenance scheduling, seasonal capacity exchange, and staggered construction." 13 NRC at 1047.

First, certain wholesale rate reductions in 1941, 1946 and 1950 were found to be anticompetitive in that they induced AEC not to build its own generating facilities. 13 NRC at 1077. Second, the Appeal Board found that Alabama Power had acted inconsistently with the antitrust laws by failing to offer AEC ownership participation in the Farley nuclear units. 13 NRC at 1086.

As a result of these findings, the Appeal Board rewrote the conditions imposed on Alabama Power's operating license.[2] Most

2. The full text of the Appeal Board's conditions is as follows:

License Conditions Approved by the Appeal Board

The following license conditions are made a part of any licenses issued by the applicant for the Joseph M. Farley Nuclear Plant, Units 1 and 2:

1. Licensee shall recognize and accord to Alabama Electric Cooperative the status of a competing electric utility in central and southern Alabama.

2. Licensee shall offer to sell to AEC an undivided ownership interest in Units 1 and 2 of the Farley Nuclear Plant. The percentage of ownership interest to be so offered shall be an amount based on the relative sizes of the respective peak loads of AEC and the Licensee (excluding from the Licensee's peak load that amount imposed by members of AEC upon the electric system of the Licensee) occurring in 1976. The price to be paid by AEC for its proportionate share of Units 1 and 2, determined in accordance with the foregoing formula, will be established by the parties through good faith negotiations. The price shall be sufficient to fairly reimburse Licensee for the proportionate share of its total costs related to the Units 1 and 2 including, but not limited to, all costs of construction, installation, ownership and licensing, as of a date, to be agreed to by the two parties, which fairly accommodates both their respective interests. The offer by Licensee to sell an undivided ownership interest in Units 1 and 2 may be conditioned at Licensee's option on the agreement by AEC to waive any right of partition of the Farley plant and to avoid interference in the day-to-day operation of the plant.

3. Licensee will provide, under contractual arrangements between Licensee and AEC, transmission services via its electric system (a) from AEC's electric system to AEC's off-system members; and (b) to AEC's electric system from electric systems other than Licensee's. The contractual arrangements covering such transmission services shall embrace rates and charges reflecting conventional accounting and ratemaking concepts followed by the Federal Energy Regulatory Commission (or its successor in function) in testing the reasonableness of rates and charges for transmission services. Such contractual arrangements shall contain provisions protecting Licensee against economic detriment resulting from transmission line or transmission losses associated therewith.

4. Licensee shall furnish such other bulk power supply services as are reasonably available from its system.

5. Licensee shall enter into appropriate contractual arrangements amending the 1972 Interconnection Agreement as last amended to provide for a reserve sharing arrangement between Licensee and AEC under which the Licensee will provide reserve generating capacity in accordance with practices applicable to its responsibility to the operating companies of the Southern Company System. AEC shall maintain a minimum level expressed as a percentage of coincident peak one-hour kilowatt load equal to the percent reserve level similarly expressed for Licensee as determined by the Southern Company System under its minimum reserve criterion then in effect. Licensee shall provide to AEC such data as needed from time to time to demonstrate the basis for the need for such minimum reserve level.

6. Licensee shall refrain from taking any steps, including but not limited to the adoption of restrictive provisions in rate filings or negotiated contracts for the sale of wholesale power, that serve to prevent any entity or group of entities engaged in the retail sale of firm electric power from fulfilling all or part of their bulk power requirements through self-generation or through purchases from some source other than licensee. Licensee shall further, upon request and subject to reasonable terms and conditions, sell partial requirements power to any such entity. Nothing in this paragraph shall be construed as preventing applicant from taking reasonable steps, in accord with general practice in the industry, to ensure that the reliability of its system is not endangered by any action called for herein.

7. Licensee shall engage in wheeling for and at the request of any municipally-owned distribution system:

(1) of electric energy from delivery points of licensee to said distribution system(s); and

(2) of power generated by or available to a distribution system as a result of its ownership or entitlement in generating facilities to delivery points of licensee designated by the distribution system.

Such wheeling services shall be available with respect to any unused capacity on the transmission lines of licensee, the use of

importantly, it ordered that AEC be granted ownership interest in the Farley plants proportionate to their power needs. AEC would, of course, pay the reasonable value for this interest. The Appeal Board concluded that only ownership access would alleviate the situation found inconsistent with the antitrust laws. 13 NRC at 1105.

When the NRC declined to exercise its discretionary review authority over the Appeal Board's decision, that decision became the final action of the NRC. This appeal resulted.[3]

II. Discussion.

On this appeal, we must decide two issues. First, whether the NRC, through its Licensing and Appeal Boards, correctly interpreted its congressional mandate under Section 105(c) of the Atomic Energy Act in the scope of its inquiry and form of its analysis of the economic structure in the relevant power markets and the past conduct of Alabama Power. If so, the second issue is whether the statute authorizes the NRC to impose these conditions on Alabama Power.

A. Our task in deciding the first issue is one of interpreting statutory meaning and discerning legislative intent. The applicable part of Section 105(c) reads as follows:

Where the Attorney General advises that there may be adverse antitrust aspects and recommends that there be a hearing, the Attorney General or his designee may participate as a party in the proceedings thereafter held by the Commission on such licensing matter in connection with the subject matter of his advice. The Commission shall give due consideration to the advice received from the Attorney General and to such evidence as may be provided during the proceedings in connection with such subject matter, *and shall make a finding as to whether the activities under the license would create or maintain a situation inconsistent with the antitrust laws. . . .*

42 U.S.C. § 2135(c)(5) (emphasis added).

In the eleven years since this section was made applicable to nuclear licensing procedures, no federal court has reviewed a final order under section 105(c). Thus, interpretation of that statute presents an issue of first impression.

■ Alabama Power argues that the words "under the license" prohibit the NRC from considering the antitrust implications of any activity of a nuclear license applicant other than those directly arising from the activity sought to be licensed. They contend that the NRC overstepped its authority in looking past the direct effects of the nuclear plant on the present or prospective competitive situation, and in considering actions of Alabama Power which preceded the license application by many years. We do not agree with this argument.

A basic tenet of statutory construction is that the express language of a statute is the primary source of its meaning. In this instance § 105(c) directs the NRC to find whether "activities under the license would create or maintain a situation inconsistent with the antitrust laws." . . . We believe that the word "create" directs the NRC to look forward to see if an anticompetitive situation could arise. But the word "maintain" must direct the NRC to take a careful look at the present—and the past—to see if an anticompetitive climate exists and to see if the applicant has acted in an anticompeti-

---

which will not jeopardize licensee's system. The contractual arrangements covering such wheeling services shall be determined in accordance with the principles set forth in Condition (3) herein.

The Licensee shall make reasonable provisions for disclosed transmission requirements of any distribution system(s) in planning future transmission. By 'disclosed' is meant the giving of reasonable advance notification of future requirements by said distribution system(s) utilizing wheeling services to be made available by Licensee.

8. The foregoing conditions shall be implemented in a manner consistent with the provisions of the Federal Power Act and the Alabama Public Utility laws and regulations thereunder and all rates, charges, services or practices in connection therewith are to be subject to the approval of regulatory agencies having jurisdiction over them.

**3.** Jurisdiction exists in this court pursuant to 42 U.S.C. § 2239 and 28 U.S.C. § 2342.

tive manner. "Size carries with it an opportunity for abuse which is not to be ignored when the opportunity is proved to have been utilized in the past." *United States v. Swift & Co.*, 286 U.S. 106, 116, 52 S.Ct. 460, 463, 76 L.Ed. 999 (1932). The amount of market power held by the applicant and the ways it has been used are relevant inquiries in determining whether there is a "situation" to maintain, and whether issuing this license will maintain it. The statute clearly calls for a broad inquiry and common sense does not allow interpretations to the contrary.

■ Alabama Power also argues that the NRC has "misapplied settled antitrust principles" in holding nuclear power license applicants to standards "inconsistent with the body of interpretation developed by the courts." They argue that in finding anticompetitive conduct on the part of Alabama Power the NRC has not used standard antitrust analysis developed in the judicial interpretation of the antitrust statutes incorporated into the Atomic Energy Act. Alabama Power argues that activities which are not actual violations of the antitrust laws cannot be proscribed by the NRC. We do not believe that the statute calls for or allows a traditional antitrust analysis.

Under the direction of the statute to determine if activities under the license will *create* a situation inconsistent with the antitrust laws, we have noted that a forward look toward potential anticompetitive results is required. Before issuing a license it is impossible to predict with absolute certainty that activities under the license will create an anticompetitive situation. For this reason, Congress did not intend that the NRC limit its concerns to activities which are mature violations of the antitrust laws. Our best source of legislative history is *The Joint Committee on Atomic Energy's Report: Amending the Atomic Energy Act of 1954, as Amended, to Eliminate the Requirement for a Finding of Practical Value, to Provide for Prelicensing Antitrust Review of Production and Utilization Facilities, and to Effectuate Certain Other Purposes Pertaining to Nuclear Facilities.* 91st Cong. 2nd Sess. 1970. The Joint Committee report squarely addressed this issue. It states,

> [t]he concept of certainty of contravention of the antitrust laws or the policies clearly underlying these laws is not intended to be implicit in this standard; nor is mere possibility of inconsistency. It is intended that the finding be based on reasonable probability of contravention of the antitrust laws or the policies clearly underlying those laws. It is intended that, in effect, the Commission will conclude whether, in its judgment, it is reasonably probable that the activities under the license would, when the license is issued or thereafter, be inconsistent with any of the antitrust laws or the policies clearly underlying these laws.

*Id.* at 14.

The NRC is to look only for "reasonable probability" of violation. This command may result in the conditioning of licenses in anticipation of situations which would not, if left to fruition, in fact violate any antitrust law. But Congress intended this broad inquiry using all available information to prevent infringement on the antitrust laws in the nuclear power field.

We also note that the Joint Committee Report did not limit the NRC's inquiry to probable contravention of the antitrust laws, but included "or the policies clearly underlying these laws." Here again, a traditional antitrust enforcement scheme is not envisioned, and a wider one is put in place.

This interpretation of Section 105(c) is consistent with Congress' basic policies toward the nuclear power industry. When the Atomic Energy Act was passed in 1954 it allowed private entry into the nuclear field for the first time. In the preceding years, scientific and technological nuclear know-how had been held exclusively by the government. This bank of information had been compiled over the years from research and development which had been financed by the American public. In turning this publicly held wealth of knowledge and scientific progress over to private enterprise, Congress felt that strict restraints should

be included to prevent unfair advantage for those with the greatest resources. Those who had worked with the government were not to be the unbridled beneficiaries of the windfall head start they would have when private parties were allowed into nuclear power production. The unique potential and critical dangers of this new resource justified tight control to ensure safety and prevent unfair monopolization. See Adams, *Atomic Energy: The Congressional Abandonment of Competition,* 158 Colum.L.Rev. 55 (1955); Cosway, *Antitrust Provisions of the Atomic Energy Act,* 179 Vand.L.Rev. 12 (1958).

In strengthening the pre-licensing procedures with the 1970 amendment, Congress did not abandon these policies.

This analysis leads us to the contention of Alabama Power that the NRC has "misapplied settled antitrust principles" in finding the relevant markets and monopoly power of Alabama Power. Those principles simply do not apply in the usual way to nuclear power regulation.

Alabama Power argues that we should not give great deference to the way the NRC interprets the statute under which it operates. We do not decide that question because we believe the NRC has interpreted the statute correctly.

█ The conclusions of the NRC concerning relevant markets in the wholesale, retail, and coordination services markets are amply supported in this extensive and thorough record. We affirm those findings and the holding that Alabama Power has exerted monopoly power in each of these markets that could and probably would lead to antitrust situations.

B. Remedy

█ The remedial scheme of this section is contained in Section 105(c)(6). If the NRC makes affirmative findings under Section 105(c)(5), it is then directed to

> also consider, in determining whether the license should be issued or continued, such other factors, including the need for power in the affected area, as the Commission in its judgment deems necessary to protect the public interest. On the basis

of its findings, the Commission shall have the authority to issue or continue a license as applied for, to refuse to issue a license, to rescind a license or amend it, *and to issue a license with such conditions as it deems appropriate.*

*Id.* (emphasis added).

Alabama Power contends that by ordering ownership access to the new nuclear plants, the NRC exceeded its authority under the above section. We disagree.

Section 105(c)(6) allows the NRC to consider factors other than the affirmative finding under 105(c)(5). In leaving the remedy to the NRC's concept of "appropriateness," Congress intended that the NRC find a remedy to address its antitrust concerns. There has been no showing that any "other factors such as the need for power" work to contradict the conditions chosen by the NRC. In the Joint Committee on Atomic Energy's report, *supra,* is the statement, "The Committee believes that, except in an extraordinary situation, Commission-imposed conditions should be able to eliminate the concerns entailed in any affirmative finding under paragraph (5) while, at the same time, accommodating the other public interest concerns found pursuant to paragraph (6)." *Id.* Here the NRC has given the AEC ownership access to the new nuclear plants which will amount to 4%—6%. This interest will allow the AEC to take advantage of congressionally conferred tax and other breaks it has as a rural electricity provider. No interference in the day to day operation of the plants or any right of severance is given AEC. These conditions do not hinder the public's need for power. (See footnote 2). On the contrary, they facilitate them. Further, and most importantly, the conditions alleviate the antitrust concerns resulting from the affirmative findings under paragraph (5). The conditions are specifically fashioned to address the anticompetitive situation which could arise from an unconditional license grant. While an affirmative condition requiring the sale of an ownership interest is indeed extreme, the approach of Congress reflects the uniqueness of legislative control over

nuclear development. Congress determined the need for great expertise and wide powers. Both the responsibility and authority were granted to the Nuclear Regulatory Commission. The imposition of ownership conditions along with conditions providing for access to Alabama Power's transmission facilities is not an abuse of nor beyond that delegated discretion. We AFFIRM the remedy.