68 F.3d 1361
 Nuclear Reg. Rep. P 20,573, 314 U.S.App.D.C.
310, 64 USLW 2303,
1995-2 Trade Cases P 71,166
 CITY OF CLEVELAND, OHIO, et al., Petitioners,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION, and The United
States of America, Respondents,
Cleveland Electric Illuminating Company, et al., Intervenors.
 Nos. 92-1532, 93-1665, 93-1672 and 93-1673.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 5, 1995.
Decided Oct. 27, 1995.
 
 On Petitions for Review of Orders of the Nuclear Regulatory Commission.
 Reuben Goldberg, Washington, DC, argued the cause for petitioners City of Cleveland, Ohio, et al. With him on the briefs were Channing D. Strother, Jr., David R. Straus and Gregg Ottinger.
 James P. Murphy, Washington, DC, argued the cause for petitioners Cleveland Electric Illuminating Company, Ohio Edison Company and Toledo Edison Company. With him on the briefs were Gerald Charnoff and Mitchell S. Ross.
 Grace H. Kim, Washington, DC, Attorney, United States Nuclear Regulatory Commission, argued the cause for respondent. With her on the brief were Anne K. Bingaman, Assistant Attorney General, John J. Powers, III, Attorney, Marion L. Jetton, Attorney, United States Department of Justice, Karen D. Cyr, General Counsel, John F. Cordes, Jr., Solicitor, and E. Leo Slaggie, Deputy Solicitor, United States Nuclear Regulatory Commission. Marjorie S. Nordlinger, Attorney, United States Nuclear Regulatory Commission, entered an appearance for respondent.
 James P. Murphy, Washington, DC, argued the cause for intervenors Cleveland Electric Illuminating Company, Toledo Edison Company and Ohio Edison Company. With him on the briefs were Gerald Charnoff and Mitchell S. Ross.
 Reuben Goldberg, Washington, DC, argued the cause for intervenors City of Cleveland, Ohio, et al. With him on the briefs were Channing D. Strother, Jr., David R. Straus, Scott H. Strauss, Gregg D. Ottinger and D. Baird MacGuineas. John P. Coyle entered an appearance for intervenor City of Brook Park, Ohio.
 Before WALD, SILBERMAN and ROGERS, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 Petitioners Cleveland Electric Illuminating Company, Ohio Edison Company, and Toledo Edison Company ("Licensees") seek review of an order by the United States Nuclear Regulatory Commission ("NRC" or "Commission") denying their applications to suspend antitrust conditions imposed on two nuclear power plants owned by Licensees. The City of Cleveland, American Municipal Power-Ohio, and the City of Brook Park ("Cleveland") also appeal a separate order by the Commission denying their challenge to its statutory authority to suspend antitrust conditions. We affirm the Commission's order denying Licensees' suspension applications. We also hold that Cleveland has not demonstrated it was aggrieved by the ruling it challenges, and therefore dismiss Cleveland's petition without reaching the merits.
 
 I. BACKGROUND
 
 2
 The Atomic Energy Act of 1954, as amended, ("AEA" or "Act") authorizes the NRC to impose remedial conditions on a nuclear power plant if "activities under the [plant's operating] license would create or maintain a situation inconsistent with the antitrust laws." AEA, 42 U.S.C. Sec. 2135(c)(5) (1988) ("Sec. 105(c)"). To ensure that conditions are imposed as necessary, the Act directs the NRC to seek a recommendation from the Attorney General and make a finding as to whether the plant's activities will have an adverse antitrust impact, before issuing a license. Id.
 
 A. Initial License Proceedings
 
 3
 As required by the Act, the NRC considered potential antitrust problems during the initial license proceedings for the two plants owned by Licensees, the Perry Nuclear Power Plant and the Davis-Besse Nuclear Power Station. Toledo Edison Co., 10 N.R.C. 265 (1979), aff'g as modified 5 N.R.C. 133 (1977). Because the Commission's findings are relevant to the question of whether the license conditions can be retained even though the power produced by these stations turned out to be higher in cost than power from alternative sources, we discuss those proceedings in some detail.
 
 
 4
 In its order imposing antitrust conditions on the plants, the Commission first made extensive findings of fact about ongoing anticompetitive acts by the Licensees that were directed against smaller electric utilities in the region competing with Licensees for sale of wholesale and retail power. The three Licensees who are petitioners in this proceeding, along with two other neighboring electric utilities who did not join petitioners' suspension request, formed a regional power pool called the Central Area Power Coordination group ("CAPCO"). The purpose of CAPCO was to "coordinate installation of generation and transmission in order to further reliability and to take advantage of scale economies." 5 N.R.C. at 152. Each CAPCO member dominated generation, transmission, and sale of electric energy within its particular service area, controlling between 94% and 100% of all generating capacity and transmission facilities, and accounting for between 94% and 100% of retail and wholesale sales. 5 N.R.C. at 153-54. This dominance was maintained, in part, by the companies' decision to operate as a unified system. CAPCO members coordinated their operation through connections among all of the utilities ("interconnection"); sharing of power reserves during times of shortage, maintenance outages, and construction; and exchange and sale of various types of power at low rates. 5 N.R.C. at 154-55. CAPCO companies also engaged in coordinated development, constructing shared generating units and transmission facilities according to a joint plan. 5 N.R.C. at 153.
 
 
 5
 Not only did CAPCO members realize the legitimate benefits of economies of scale and coordinated operation, but more importantly, they used this arrangement to forestall competition from other smaller utilities in the region. CAPCO members avoided competition among themselves, through either explicit agreements or failure to solicit customers of fellow CAPCO utilities. 5 N.R.C. at 143, 190-95, 214-17. They denied competing utilities membership in the power pool and refused to make available to competitors any of the benefits of interconnection, including sharing of reserves and exchanges of emergency or economy rate power. 5 N.R.C. at 144 n. 9, 224-25, 227-31. CAPCO utilities also refused to "wheel" power, or transport it from outside utilities across their transmission lines, to competing utilities inside CAPCO territory. 5 N.R.C. at 144 n. 9. Due to economic and regulatory constraints, competitors could not construct their own duplicative transmission lines and, without CAPCO's cooperation, could not obtain access to outside power sources. 5 N.R.C. at 156-58. These competitors were often left with only one option--buying power from CAPCO utilities for resale--but CAPCO companies would sell their power only if competitors agreed to rate-fixing and other unfair and anti-competitive terms. 5 N.R.C. at 167-68, 177-78, 180-82, 200-03.
 
 
 6
 After examining these facts, the Commission concluded that the market structure created by CAPCO members through their formation of an exclusive power pool gave them the ability to prevent competing utilities from gaining access to the benefits of coordinated operation and economy of scale which they themselves enjoyed, and that this ability had, in fact, been used to create and maintain a situation inconsistent with the antitrust laws. 5 N.R.C. at 238-41, 255; 10 N.R.C. at 281. The cooperative arrangement made this situation possible even though the power offered by CAPCO companies was higher in price than the power of competing smaller utilities. 5 N.R.C. at 166 ("Rates and quality of service were and are the principal elements of competition between these utilities, with Cleveland traditionally offering lower rates and CEI greater reliability." (citations omitted)).
 
 
 7
 Pursuant to Sec. 105(c), the Commission also determined that a substantial nexus existed between this anticompetitive situation and the construction of the nuclear plants at issue: the significant increase in generating capacity provided by the plants[1] would strengthen CAPCO's dominance of the regional electric power industry. 5 N.R.C. at 238-39 ("Within the [CAPCO territory], the generation of the nuclear units ineluctably will have a substantial effect on the supply and cost of power for each of the five Applicant companies."). Specifically, the new units would enhance Licensees' competitive position by "produc[ing] economies of scale and ... provid[ing] for long term generation costs well under average system costs which could be obtained either compared to the cost of operating their present generating equipment or in comparison to new generation relying upon fossil fueled units." 5 N.R.C. at 143. Additionally, the Commission found a strong link between plans to construct new nuclear plants and plans to expand transmission facilities. The new plants would be cost-effective only if the CAPCO companies agreed to build additional shared high voltage transmission lines, and these extra transmission facilities, in turn, would make it even more difficult for smaller utilities to build alternative transmission systems. 5 N.R.C. at 156, 240. In sum, the Commission found, construction of the plants was "calculated to further increase [Licensees'] dominance" and thus maintained a situation inconsistent with the antitrust laws. 5 N.R.C. at 144. Although the Commission expected that nuclear power would be low-cost and thus particularly advantageous to Licensees, its conclusions also rested on the degree to which the existing market structure allowed Licensees to control competitors' power supply options. 5 N.R.C. at 238-41.
 
 
 8
 As a remedy, the NRC imposed antitrust conditions on the plants' licenses that were designed to ameliorate the competitive advantages conferred on licensees by ownership of the plants. 10 N.R.C. at 278. These conditions prohibited Licensees from making the sale of wholesale power or the coordination of services contingent upon agreements to allocate customers, forgo alternative power supplies, or refrain from participating in Commission antitrust proceedings. The conditions also required Licensees to connect their transmission lines with those of their competitors; wheel power for competitors; open up membership in CAPCO to competitors in the CAPCO territory; sell various types of power to competitors on the same terms offered to CAPCO members; share power reserves with interconnected facilities that generate their own power; and give competitors access to power generated by Licensees' nuclear plants. 10 N.R.C. at 296-99.
 
 
 9
 B. Current Proceedings on Licensees' Request to Suspend Antitrust Conditions
 
 
 10
 Almost a decade later, Licensees filed applications with the NRC to suspend these Sec. 105 license conditions. The Licensees claimed that, contrary to the expectations which had motivated passage of Sec. 105 antitrust protections, the cost of nuclear power far exceeded the cost of power from alternative sources. Thus, the Licensees argued, ownership of a nuclear plant could not confer any of the competitive advantages that Congress had feared and, given this turn of events, Sec. 105(c) prohibited the NRC from retaining antitrust conditions on a nuclear plant that generated high cost power. After NRC staff rejected these applications for suspension, see Notice of Denial, 56 Fed.Reg. 20,057 (May 1, 1991), Licensees petitioned for a hearing on the denial.
 
 
 11
 At this juncture, Cleveland entered the proceedings to oppose Licensees' hearing request, arguing that the NRC had no statutory authority to consider applications for suspension of antitrust license conditions. Alternatively, Cleveland sought to intervene in any hearing held on the applications so that it could oppose the requested suspensions. The Atomic Safety and Licensing Board ("Licensing Board") dismissed Cleveland's petition on the grounds that the NRC did have authority to grant Licensees a hearing and to modify antitrust conditions subsequent to issuance of a license, and granted Cleveland's request to intervene. Ohio Edison Co., 34 N.R.C. 229, 238, 239-45 (1991) (Prehearing Conference Order). Cleveland appealed the Licensing Board's rejection of its challenge to the Commission's authority to suspend, and the Commission affirmed that authority under several sections of the AEA. Ohio Edison Co., 36 N.R.C. 47, 59 (1992). Cleveland now petitions for review of that decision by this court.
 
 
 12
 In a subsequent stage of the proceedings, the Licensing Board considered the "bedrock" legal issue presented by the parties:
 
 
 13
 Is the Commission without authority as a matter of law under Section 105 of the Atomic Energy Act to retain the antitrust license conditions contained in an operating license if it finds that the actual cost of electricity from the licensed nuclear power plant is higher than the cost of electricity from alternative sources, all as appropriately measured and compared?[2]
 
 
 14
 The Board ruled that neither the plain meaning of Sec. 105(c), the provision's legislative history, general principles of antitrust law, nor prior NRC cases required a threshold showing of low-cost power production in order to maintain antitrust conditions challenged by a licensee. 36 N.R.C. at 289-306. The Commission declined to accept Licensees' petition for review of the Board's decision, thereby converting the ruling into final agency action. See 10 C.F.R. Sec. 2.786(c) (1995).
 
 
 15
 Licensees now appeal the NRC's ruling on the "bedrock" legal issue. They argue that the Commission ignored the plain meaning of Sec. 105(c) by asserting the authority to maintain antitrust conditions on the operation of a plant even when the cost of the nuclear power generated is higher than that of alternative sources of power. Cleveland also appeals the Commission's rejection of its challenge to the NRC's statutory authority to consider requests to suspend conditions under any circumstances. In response to Cleveland, the NRC contends that since Cleveland basically prevailed in the underlying proceeding which refused to suspend the conditions, it is not a "party aggrieved" as required by the Hobbs Act. 28 U.S.C. Secs. 2342(4), 2344 (1988). We consider each challenge in turn.II. "BEDROCK" LEGAL ISSUE
 
 
 16
 The parties involved in the proceedings below formulated one issue for the NRC to address in considering Licensees' suspension application: Does Sec. 105(c) permit the NRC to retain antitrust conditions on the operation of a nuclear plant when the cost of power generated by the plant is higher than the cost of power from available alternative sources?[3] In reviewing the NRC's answer to this question, we begin with the familiar principles of Chevron, which instruct that:
 
 
 17
 If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.... [But if] the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
 
 
 18
 Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). As explained in greater detail below, we certainly cannot find in Sec. 105(c) any clear signal that a threshold showing of low-cost power production is or is not required in order to retain antitrust conditions on a license under Sec. 105(c), and so we proceed to the second step of Chevron to examine whether the NRC's construction of that provision was reasonable and consistent with the purpose and structure of the Act and relevant legislative history. Ultimately, we find the NRC's interpretation of Sec. 105(c) permissible.
 
 A. Chevron Step One
 
 19
 Paradoxically, both Licensees and the NRC contend that Congress has clearly spoken to the question of whether Sec. 105(c) requires a preliminary finding of low-cost power production as a prerequisite to antitrust conditions. In determining whether clear intent exists, we look to the language of the statute, as well as "the language and design of the statute as a whole."[4] Fort Stewart Schools v. FLRA, 495 U.S. 641, 645, 110 S.Ct. 2043, 2046, 109 L.Ed.2d 659 (1990) (quoting K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988)); Tataranowicz v. Sullivan, 959 F.2d 268, 276 (D.C.Cir.1992) (citing McCarthy v. Bronson, 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991); Crandon v. United States, 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990)), cert. denied, --- U.S. ----, 113 S.Ct. 963, 122 L.Ed.2d 120 (1993).
 
 
 20
 Focusing their argument on the phrase in Sec. 105(c)(5) that grants authority to impose conditions if "activities under the license" have an adverse antitrust impact, Licensees argue that these four words restrict the NRC's antitrust authority to situations where it can demonstrate that the actual operation of the plant creates or maintains an anticompetitive situation. Licensees claim that since electricity is a fungible commodity, the only difference between electricity generated by their nuclear plants and that from alternative sources is cost. Thus, ownership of a nuclear plant which generates more costly power than that of competitors necessarily imposes a competitive disadvantage, rather than enhancing the owner's competitive position on that basis. Licensees urge us to conclude that as a matter of law, any invocation of Sec. 105(c) requires a preliminary showing that the power generated by the licensed plant is lower in cost than power from available alternative sources. There is a ready response to that argument.
 
 
 21
 Had Congress intended to require a threshold showing of low-cost power production before allowing the NRC to regulate under Sec. 105(c), or had it determined that high-cost plants could not pose a competitive threat, we believe it would have phrased that intent much more precisely. As it is, no reference at all is made to the cost of power in Sec. 105(c). In fact, the plain language of Sec. 105(c) undercuts Licensees' argument. As the initial license proceedings surrounding these plants well demonstrate, various plant "activities," such as generation of power that increases a utility's total capacity and reliability, or the construction of transmission facilities that make a new plant economically feasible, may further strengthen a utility's position in the regional electricity market, regardless of the cost of power generated by the plant. The words chosen by Congress allow a linkage of the NRC's antitrust authority to these kinds of "activities," rather than making it contingent only upon power costs.
 
 
 22
 Conversely, the NRC asserts that Sec. 105(c)(5) clearly instructs the NRC to engage in a traditional antitrust analysis, as opposed to considering the higher cost of power as a threshold barrier beyond which no further analysis is necessary. It pins this claim on three other subsections of Sec. 105 that discuss the Commission's regulatory authority. The NRC contends that these provisions refer to utility behavior, not just cost, and argues that we must construe Sec. 105(c)(5) in a similar manner. The NRC first directs our attention to Sec. 105(c)(2), which directs the Commission to consider a "licensee's activities or proposed activities" in determining whether a second antitrust review is necessary before issuance of an operating permit. 42 U.S.C. Sec. 2135(c)(2). Because that provision refers to "proposed activities," the Commission argues, it must encompass more than changes in cost of power, which can never be wholly within the licensee's control. While this provision does make clear that the statute does not limit the NRC to considerations of cost in assessing the need for a second antitrust review, neither does it clearly prohibit the NRC from imposing a threshold requirement of low-cost power production should it determine that low cost was an indispensable ingredient to any finding of anticompetitive impact. The NRC also points to Secs. 105(a) and (b), which warn that the NRC's antitrust authority does not relieve licensees from compliance with other antitrust laws and require the NRC to report violations of those laws, as bolstering its argument that Congress did not intend to limit interpretation of "activities" to considerations of cost alone. 42 U.S.C. Secs. 2135(a), (b). We do not see how these provisions compel or even advance the reading of Sec. 105(c)(5) that the NRC advocates. The NRC's efforts to construe Sec. 105(c) as an unambiguous directive not to impose a low-cost threshold for antitrust conditions fails as well.
 
 B. Chevron Step Two
 
 23
 If, then, Sec. 105(c) does not clearly require a threshold showing of low-cost power production in order to retain antitrust conditions, we must defer to the NRC's interpretation if it is reasonable and consistent with the statutory scheme and legislative history. Chevron, 467 U.S. at 845, 104 S.Ct. at 2783 (if agency's interpretation "represents a reasonable accommodation ..., we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned" (quoting United States v. Shimer, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961))). We find the NRC's construction reasonable, and thus we affirm its denial of Licensees' suspension applications.[5]
 
 
 24
 This question comes to us in a somewhat awkward posture. Licensees explicitly elected not to argue that the circumstances justifying the original imposition of Sec. 105 conditions no longer existed, choosing instead to present only the "bedrock" legal question of whether the NRC is ever permitted to retain conditions when a nuclear plant's power costs more than power from alternative sources.[6] Thus, Licensees have not attempted to show that under this particular scenario, the high-cost power generated by their plants does not have any anticompetitive impact, despite the other advantages of reliability and coordination that they enjoy. Nor has the NRC sought to prove that in this specific context, operation of Licensees' plants still confers a competitive advantage, regardless of cost. As a result, we are left to consider the near-hypothetical question posed by the "bedrock" issue without the benefit of extensive factual development in a concrete situation.
 
 
 25
 For Licensees to persuade us that the NRC's interpretation of Sec. 105(c) is unreasonable, they must show that there is no set of circumstances where a plant producing high-cost power could contribute to a situation inconsistent with the antitrust laws. Licensees contend that the power generated by a nuclear plant is a fungible commodity which must compete with electricity from other sources; if power from a licensee's nuclear plant costs more than power from alternative sources, then licensees are necessarily disadvantaged vis-a-vis their competitors and cannot pose an anticompetitive threat. This analysis, however, with its exclusive focus on the cost of power, totally ignores other factors that may affect the competitive position of any producer. See LAWRENCE A. SULLIVAN, HANDBOOK OF THE LAW OF ANTITRUST 74-93 (1977) (factors indicating market power include market concentration, entry barriers, firm conduct, excessive profits, rigid pricing policies, price discrimination, and firm size). More to the point, it ignores several factors that the NRC considered dispositive in finding anticompetitive behavior on the part of these very Licensees when it first imposed antitrust conditions.
 
 
 26
 In the initial proceedings, the NRC identified a number of competitive advantages accruing to Licensees from their participation in the CAPCO power pool, all of which predated construction of the nuclear plants at issue here and existed despite the pivotal fact that even then, CAPCO's power was more costly than that of competing utilities. As previously discussed, the Commission at the time of the initial licensing found that Licensees had almost complete dominance over the generation, transmission, and sale of electric power in the CAPCO territory. It also found that Licensees had exercised this power in an anticompetitive fashion: they had refused to wheel competitors' power or allow them access to transmission facilities for carrying alternative sources of power; prevented competitors from joining the CAPCO pool, sharing power reserves, or selling or exchanging various types of power at low rates; and denied them the economies of scale and other benefits of coordinated planning and construction.
 
 
 27
 The Commission ruled that these circumstances constituted a situation inconsistent with the antitrust laws, and that the resulting increase in CAPCO's generating capacity and transmission facilities would enhance Licensees' market position and its ability to maintain entry barriers which precluded full participation by competing utilities. Licensees offer no compelling reason why these same factors that led the NRC to find a situation inconsistent with antitrust laws should not now be sufficient to maintain antitrust authority under Sec. 105(c). Licensees still exercise market control in the CAPCO territory, and the power generated by the nuclear plants contributes to that dominance by providing increased total capacity and greater reliability. Nuclear power may be higher in cost than available non-nuclear power, but just as higher-cost power generated by Licensees before construction of the nuclear plants did not prevent them from controlling competitors' power supply options, higher-cost power from a nuclear plant could have the same anticompetitive effect. Expanded transmission facilities built as part of the nuclear construction program further strengthen Licensees' ability to deprive competitors of access to alternative power sources. Absent the license conditions, there is no intrinsic reason why Licensees could not again use their market dominance to weaken and eliminate competitors, despite the higher cost of their power. Thus, we determine that the NRC reasonably answered the "bedrock" question in deciding that a threshold showing of lower cost nuclear power was not required as an indispensable prerequisite of retaining antitrust conditions.[7]
 
 
 28
 Licensees also contend that the NRC's interpretation is inconsistent with Sec. 105's legislative history, pointing to several instances where witnesses appearing before Congress during hearings on Sec. 105(c)[8] stated their belief that nuclear power would prove to be a cheap source of power. The NRC does not contest this point, acknowledging that "at one time the Commission and ... Congress ... anticipated that the electricity produced at nuclear facilities would be lower cost as compared to alternative sources." 36 N.R.C. at 296 (NRC denial of Licensees' suspension applications). Congress' mistaken assumptions about the relative costs of nuclear power, however, do not resolve the "bedrock" question. Even if Congress did believe that nuclear plants would generate a wealth of cheap power, it gave no indication in text or committee reports that the success of that prediction was in any way the touchstone of Sec. 105(c) authority. The Joint Committee Report, for example, makes no mention of cost at all, either as a background presumption informing the boundaries of the NRC's antitrust authority, or as a necessary prerequisite for exercise of that authority. Report By the Joint Committee on Atomic Energy, H.R.REP. NO. 1470, 91st Cong., 2d. Sess. 15 (1970) U.S.Code Cong. & Admin.News 1970, p. 4981. See Power Reactor Development Co. v. International Union of Elec., Radio & Mach. Workers, 367 U.S. 396, 409, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961) (noting "peculiar responsibility and place of the Joint Committee" in developing statutory scheme); accord Alabama Power Co. v. NRC, 692 F.2d 1362, 1368 (11th Cir.1982), cert. denied, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983). Thus, the legislative history of Sec. 105(c) does not alter our conclusion that the NRC reasonably interpreted that provision in the proceeding below.[9]
 
 
 29
 III. NRC's STATUTORY AUTHORITY TO SUSPEND ANTITRUST CONDITIONS
 
 
 30
 Cleveland asks us to reverse the Commission's ruling that it has authority to modify antitrust license conditions imposed pursuant to Sec. 105(c). Because we decide that Cleveland did not satisfy the statutory requirements for appealing the final order of an administrative agency, we do not pass on the question.
 
 
 31
 The Hobbs Act permits "[a]ny party aggrieved by [a] final order"[10] of the Nuclear Regulatory Commission to file a petition for review in the appropriate court of appeals. 28 U.S.C. Sec. 2344. In determining when a party is aggrieved, this circuit has recognized only a few exceptions to the general rule that "a party may not appeal from a disposition in its favor." Showtime Networks, Inc. v. FCC, 932 F.2d 1, 4 (D.C.Cir.1991) (citing cases). Cleveland claims that it falls within the exception set forth in International Brotherhood of Electrical Workers v. ICC, 862 F.2d 330 (D.C.Cir.1988) ("IBEW"). In IBEW, the court permitted petitioner union IBEW to challenge the ICC's jurisdiction to review arbitration awards, even though it had prevailed on the merits of the specific arbitration award before the ICC. Id. at 334. The court found IBEW's plight extraordinary because arbitration proceedings were a central component of the union's operation, IBEW would be forced to litigate numerous future arbitration awards before the ICC, without any opportunity for resolution of its jurisdictional claim until it lost an arbitration proceeding on the merits and could appeal. This threat of repeatedly having to pursue disputes with employers was sufficient to render IBEW aggrieved, despite its victory on the merits of the individual case. Cf. Shell Oil Co. v. FERC, 47 F.3d 1186, 1202 (D.C.Cir.1995) (IBEW exception inapplicable where petitioner would not incur "virtually inevitable and repeating costs" in future litigation before reviewing agency).
 
 
 32
 The risk of future litigation by Licensees over the antitrust conditions at issue in this case seems neither so inevitable nor of such a magnitude as to bring Cleveland within the IBEW exception. Cleveland does claim that repeat litigation over the conditions is virtually guaranteed because of the past adversarial relationship between the parties. But while it is of course possible that Licensees will renew their efforts to suspend the antitrust conditions through a claim of "changed circumstances" and in such an event, Cleveland may find it necessary to return to court to defend the restrictions, see Respondents' Br. at 19 (discussing Cleveland's remedies if Licensees should seek a future modification of antitrust conditions), IBEW requires more. It demands a showing of an "inevitable and repeating" course of litigation, between the same parties, all based on a single jurisdictional issue. We find the inchoate threat of another round of litigation about these conditions based on a new theory not to rise to the level of potential harm incurred by the labor union petitioners in IBEW. Accordingly, Cleveland is not a "party aggrieved," and we dismiss its petition for review.
 
 
 33
 So ordered.
 
 
 
 [1]
 The combined generating capacity of CAPCO members prior to construction of the plants was approximately 13,000 megawatts, and CAPCO anticipated that the new plants would add an extra 4,500 megawatts. 5 N.R.C. at 143
 
 
 [2]
 Ohio Edison Co., 36 N.R.C. 269, 280 (1992). At the request of the Licensing Board, this question was formulated in a joint statement filed by the parties. They agreed that if Licensees prevailed on this issue, the Board would then hold a second, evidentiary proceeding to assess whether the power produced by Licensees' facilities was, in fact, higher in cost than available alternative sources. If Licensees did not prevail at the first stage on the legal question, the proceedings would terminate prior to a determination of the comparative costs of available power sources. Id. at 280-81
 
 
 [3]
 Although the NRC did not parse any further the meaning of the parties' joint articulation of the "bedrock" issue, we assume the cost of power from "alternative" sources means sources that are available to Licensees' purchasers. See, e.g., 34 N.R.C. at 254 n. 80 (Prehearing Conference Order) ("bedrock" issue involves comparison of "actual facility costs for Davis-Besse and Perry" plants with "non-nuclear power costs"); 36 N.R.C. at 279 (comparison of "cost of electricity generated at a nuclear facility" with "that from other competing sources"); 36 N.R.C. at 291 (comparison of cost of electricity produced by nuclear facility with that of "rival producers")
 It should be noted that at oral argument, counsel for the Licensees contended that the NRC should have examined another variable in considering the "bedrock" issue: the cost of alternative sources of power, coupled with other factors such as their reliability and accessibility. Licensees did not explore this issue in their briefs, and were in fact able to point to only one oblique reference in their reply brief to this expanded definition of "alternative." It might be the case that if other utilities have not only cheaper sources of power, but also equivalent reliability and access to transmission facilities, more expensive power from a nuclear plant could not pose a competitive threat and Sec. 105(c) conditions would not be needed. That question, however, was not considered by the NRC, and it is not before this court now.
 
 
 [4]
 In addition, we may consider a provision's legislative history in the first step of Chevron analysis to determine whether Congress' intent is clear from the plain language of a statute. See, e.g., American Scholastic TV Programming Found. v. FCC, 46 F.3d 1173, 1180 (D.C.Cir.1995) (citing Associated Gen. Contractors v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)); Ohio v. United States Dep't of the Interior, 880 F.2d 432, 450 (D.C.Cir.1989) ("We next examine the legislative history ... to ascertain if there are any countervailing indications to our conclusion and also to check on [whether] certain parts of the history are inconsistent with our conclusion and so render the statute ambiguous within the meaning of Chevron."). Because the legislative history of Sec. 105(c) is not dispositive even for purposes of determining whether the NRC's interpretation was reasonable, see infra part II.B., we do not discuss it further here
 
 
 [5]
 Although the Commission's decision spoke of Sec. 105(c) as "requiring" a traditional antitrust analysis under a "plain meaning" reading, its lengthy opinion treated fulsomely why such a multifaceted economic analysis was necessary to give meaning to the provision. 36 N.R.C. at 287-306. We note that the NRC also argued in its brief to this court that it should prevail under both the first and second steps of Chevron. In those circumstances, we are authorized to affirm the Commission under a Chevron step two analysis, despite our rejection of the Commission's Chevron step one argument. See GMC v. National Highway Traffic Safety Admin., 898 F.2d 165, 171-72 (D.C.Cir.1990) (reviewing court may resolve statutory interpretation question under Chevron step two analysis without remand where agency has woven "policy and administrative concerns" into its textual and historical arguments)
 
 
 [6]
 Licensees initially appeared to make a "changed circumstances" claim before the NRC. Later, though, they clarified their intent to abandon that line of argument and focus solely on the "bedrock" legal issue. Although of course we do not consider the viability of a changed circumstances argument here, Licensees remain free to raise such a claim in a subsequent application proceeding
 
 
 [7]
 Our determination that Sec. 105(c) does not require the NRC to focus solely on the cost of nuclear power accords with the position of the one other circuit that has considered the scope of the NRC's antitrust authority under Sec. 105(c). In Alabama Power Co. v. NRC, owners of a nuclear plant argued that the NRC could examine only the direct activities of a licensed plant in assessing whether antitrust conditions were appropriate, rather than evaluating prior anticompetitive activities by the licensee as well. 692 F.2d 1362, 1367-68 (11th Cir.1982), cert. denied, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983). The court held that a Sec. 105(c) analysis necessitates a "broad inquiry using all available information." Id. at 1368
 
 
 [8]
 In 1970, Congress amended the Atomic Energy Act, enacting the current version of Sec. 105(c)(5). Act of Dec. 19, 1970, Pub.L. No. 91-560, Sec. 6, 84 Stat. 1472, 1473
 
 
 [9]
 Licensees also argue that the NRC's ruling was at odds with prior agency decisions construing Sec. 105(c). We do not find these decisions squarely on point here; while discussing the scope of the NRC's authority under Sec. 105(c)(5), they do not consider whether that authority is limited to nuclear plants that produce low-cost power
 
 
 [10]
 The government contended that the Commission's ruling on Cleveland's challenge was an interlocutory order entered as part of the proceedings on Licensees' suspension requests, and thus not appealable under the Hobbs Act. Respondents' Br. at 15-17. This characterization is erroneous. Although proceedings on the "bedrock" legal issue were still pending, Cleveland exhausted all administrative remedies as to its claim regarding the NRC's authority to consider suspension requests, and the Commission issued a final ruling on this specific issue when it denied Cleveland's appeal from the Licensing Board's decision. Thus, the Commission's decision was a "final order" for purposes of the Hobbs Act