**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff**

**v.**

**EXXON CORPORATION, Defendant.**

**Civil Action Nos. 3:95–CV–1311–H, 3:95–CV–2537–H.**

United States District Court,
N.D. Texas,
Dallas Division.

April 10, 1998.

Katherine Elizabeth Bissell, Jeffrey Charles Bannon, Chrys Meador, Carla J. Vogel, Equal E.E.O.C., Dallas Dist. Office, Dallas, TX, Ann Elizabeth Reesman, Ellen Duffy McKay, McGuiness & Williams, Washington, DC, for E.E.O.C.

Peter Bennett, Bennett & Associates, Portland, ME, Donald J. Logan, Murphy, Logan, Bardwell & Day, Napa, CA, John Marshall True, III, Marcie Elien Berman, Rudy, Exeirod, Zieff & True, San Francisco, CA, Kathleen A. Herdell, Law Office of Kathleen Herdell, Saint Helena, CA, for Allen Hartman, Alfred Trott.

William C. Strock, Felicity Anne Fowler, Haynes & Boone, Dallas, TX, Sarah Ruth Saldana, Ronald L. Palmer, Baker & Botts, Dallas, TX, Lori E. Romley, Douglas Dexter, O'Melveny & Myers, San Francisco, CA, Nicholas Vincent, Douglas Bernard Neagli, Exxon Company USA, Houston, TX, Christopher G. Bell, Jackson, Lewis, Schnitzler & Krupman, Minneapolis, MN, for Exxon Corp.

William C. Strock, Haynes & Boone, Dallas, TX, James Severson, Cynthia Jane Woolley, McCutchen, Doyle, Brown & Enerson, San Francisco, CA, Ulrico S. Rosales, McCutchen, Doyle, Brown & Enersen, Palo Alto, CA, for Seariver Maritime Financial Holdings Inc.

Michael Scott McDonald, Littler, Mendelson, Dallas, TX, for Institute for Drug–Free Workplace, amicus.

Ann Elizabeth Reesman, Ellen Duffy McKay, McGuiness & Williams, Washington, DC, for Equal Employment Advisory Counsel.

### ORDER

SANDERS, Senior District Judge.

After making the required independent review, the Court **ADOPTS** the February 27, 1998 Findings, Conclusions and Recommendation of the United States Magistrate Judge Jane J. Boyle, and **OVERRULES** all Objections thereto.

SO ORDERED.

### FINDINGS, CONCLUSIONS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

BOYLE, United States Magistrate Judge.

Before the Court is the **Plaintiff's Motion to Strike Defendant's Affirmative Defenses Nos. 14, 15, 21, 24, 25 and 26, ("Pl's Mot. to Strike")** filed October 15, 1997, and the **Plaintiff EEOC's Supplemental Brief in Support of its Motion to Strike Defendant's Affirmative Defenses, ("Pl's Supp. Br.")** filed January 8, 1998. These motions were referred to the undersigned by the District Court on October 16, 1997 and December 15, 1997, respectively. At issue is whether certain affirmative defenses raised

by the defendant, Exxon Corporation ("Exxon") in this case are subject to summary judgment. Having read the pertinent pleadings and heard the arguments of the parties on this issue, this Court recommends that the plaintiff's motion be **GRANTED**, in part, and **DENIED**, in part, as follows.

### Background

This is an Americans With Disabilities Act ("ADA") case in which plaintiff, the Equal Employment Opportunity Commission ("EEOC"), contends that Exxon's Alcohol and Drug Use Policy ("policy") violates the ADA. The policy, which has been detailed in previous filings by this Court and the District Court, bars rehabilitated substance abusers from certain safety-sensitive jobs. In defense of its policy, Exxon has advanced certain affirmative defenses which the EEOC contends are deficient as a matter of law. On October 15, 1997, the EEOC filed a motion to strike Exxon's affirmative defenses pursuant to Fed.R.Civ.P. 12(f). Upon review of the motion, the District Court determined that the legal viability of Exxon's affirmative defenses was more appropriately determined pursuant to a motion for summary judgment under Fed.R.Civ.P. 56. With this in mind, on December 15, 1997, the District Court entered an Order construing the EEOC's motion to strike as a motion for summary judgment, permitting additional pleading pursuant to Rule 56 and re-referring the motion to the undersigned for hearing and recommendation. On January 8, 1998, the EEOC, filed its supplemental brief in accordance with the District Court's December 15, 1997 Order. Exxon filed its response on January 23, 1998.("Def's. Resp. Br. filed Jan. 23, 1998."). A reply brief was filed by the EEOC on January 29, 1998.("Pl's.Reply"). The EEOC's challenge to Exxon's affirmative defenses is now ripe for review.

In its motion, the EEOC takes issue with three of Exxon's affirmative defenses.[1] First, the EEOC maintains that because Exxon's policy is safety-driven, its "business necessity" defense fails as a matter of law under the ADA unless Exxon satisfies the ADA's "direct threat" test. The EEOC's also takes exception to Exxon's equitable defenses of estoppel, ratification and unclean hands. Thirdly, the EEOC seeks to prevent Exxon from defending its policy as a bona fide occupational qualification ("BFOQ").

The undersigned will address each of the EEOC's challenges to Exxon's affirmative defenses. First, however, the Court will review the summary judgment standards which guide this analysis.

### Summary Judgment Standards

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant is entitled to judgment. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only disputes about those facts will preclude the granting of summary judgment. *Id.* In a motion for summary judgment, the burden is on the movant to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir.1990). If the non-movant bears the burden of proof at trial, the movant for summary judgment need not support the motion with evidence negating the opponent's case; rather, the movant may satisfy its burden by showing that there is an absence of evidence to support the non-movant's case. *Id.; Little*, 37 F.3d at 1075.

Once the movant makes this showing, the burden shifts to the non-movant to show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986)). "This burden is not satisfied with 'some metaphysical

---

1. These affirmative defenses are set forth in Exxon's First Amended Answer to Plaintiff's Original Complaint filed September 25, 1997. The challenged affirmative defenses are set forth in paragraphs 14, 15 (business necessity), 25, 26, (equitable defenses of estoppel, ratification and unclean hands), and 24 (BFOQ) of the Exxon's First Amended Answer. Exxon has withdrawn its affirmative defense set forth in paragraph 21 of its First Amended Answer, therefore this defense will not be addressed. See Def.'s Resp. filed Nov. 12, 1997 at 12 n. 13.

doubt as to the material facts,' ... by 'conclusory allegations,' ... by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 871–73, 110 S.Ct. 3177, 3180, 111 L.Ed.2d 695 (1990); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir.1994); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994)). Rather, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (*quoting* FED. R. CIV. P. 56(e)).

In determining whether a genuine issue for trial exists, the court must view all of the evidence in the light most favorable to the non-movant. *Richter v. Merchants Fast Motor Lines, Inc.*, 83 F.3d 96, 98 (5th Cir. 1996)(per curiam); *Gremillion v. Gulf Coast Catering Co.*, 904 F.2d 290, 292 (5th Cir. 1990). If the moving party seeks to establish the absence of a material fact through the submission of affidavits, depositions, admissions, or responses to interrogatories, the non-movant may not rely solely on mere allegations or denials. Rather, the non-movant must demonstrate the existence of an issue of material fact necessitating resolution by trial through similar evidentiary materials setting forth specific facts. FED. R. CIV. P. 56(e); *Lechuga v. Southern Pac. Transp. Co.*, 949 F.2d 790, 794 (5th Cir.1992).

With these standards in mind, the Court begins its review of Exxon's affirmative defenses.

### Analysis

*1. Business Necessity*

Exxon maintains that its policy of excluding rehabilitated substances abusers from safety-sensitive positions is defensible as a "business necessity" under the ADA. The ADA permits an employer to impose qualification standards that screen out the disabled so long as those standards are shown to be "job-related" and "consistent with business necessity." 42 U.S.C. § 12112(b)(6). Exxon relies on several factors to justify its policy as a business necessity. In addition to safety, Exxon claims its "concerns for the environment, potential tort and criminal liability, unique corporate citizenship concerns and commitments" combine to vindicate its policy under the ADA.[2] The EEOC, on the other hand, views the applicability of the business necessity defense to Exxon's policy on much more narrow terms. The EEOC strongly urges that the safety-driven nature of Exxon's policy triggers the stringent "direct threat" test tailored to defending safety-based qualification standards.[3] According to the EEOC, when a policy, like Exxon's, is grounded in safety, the business necessity defense, can only be satisfied by establishing that the individuals excluded from the positions pose a direct threat to the health or safety of other individuals in the workplace. The EEOC dismisses Exxon's concerns of exposure to civil and criminal liability, the environment and its corporate interests arguing that these factors cannot be relied upon to defend a safety-based policy.

With these divergent views of the business necessity defense as a backdrop, the issue before the Court is whether Exxon is relegated to defending its safety-based policy as "consistent with business necessity" under the rigorous direct threat standard or whether the Act permits the more broad-based business necessity defense urged by Exxon.

Whichever view of the Act is correct, no Circuit appears to have addressed this pre-

---

**2.** Def.'s Resp. Br. filed January 23, 1998 at 14.

**3.** Exxon maintains that its policy encompasses more than safety concerns. Def.'s Resp. Br. filed Jan. 23, 1998 at 14–16. These non-safety related interests, cited above, include matters such as its corporate commitments, and potential civil and criminal liability. The court, however, can discern no rationale behind the policy other than safety. As will be discussed later, a qualification

standard that screens out or tends to screen out the disabled must be tied to an essential function of the job in order to be consistent with business necessity See pgs. 641–642, infra, citing 29 C.F.R Part 1630 App. § 1630.10. An examination of Exxon's "non-safety" concerns reveals that they relate soley to the *safe* performance of the jobs in question. For this reason, throughout these findings, the court has characterized Exxon's policy as safety-based.

cise question.[4] Despite the lack of case authority, however, for the reasons that follow, this Court finds that the statute itself, its legislative history, and corresponding regulations, militate in favor of finding that safety-related qualification standards cannot be justified absent a showing that the affected employees constitute a direct threat.

In addressing this issue, the Court first turns to the relevant portions of the ADA.

### A. The ADA

■■■ To determine the appropriate standard of defense for safety-based qualification criteria under the ADA, the court naturally looks first to the statute itself. "The starting point in every case involving construction of a statute is the language itself." *Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979) (other citations omitted). If it is determined that Congress has directly spoken on the precise issue, no further inquiry of the legislative history or corresponding regulations is necessary, and the court must " 'give effect to the unambiguously expressed intent of Congress.' " *United Services Automobile Association v. Perry*, 102 F.3d 144, 146 (5th Cir.1996) (quoting *Chevron U.S.A., Inc. v.*

*Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694, (1984)). "A statute is ambiguous if it is susceptible of more than one accepted meaning." *Perry*, 102 F.3d at 146 citing *MCI Telecommunications Corp. v. American Tel. & Tel. Co.*, 512 U.S. 218, 114 S.Ct. 2223, 2230, 129 L.Ed.2d 182 (1994) (other citations omitted). If a statute is silent or ambiguous on the matter at issue, the court must look to the agency's construction of the statute to determine if it is a permissible construction. *Reich v. Arcadian Corp.*, 110 F.3d 1192, 1195 (5th Cir.1997)(citing *Perry*, 102 F.3d at 146).

■■■ Unfortunately, the ADA itself provides little instruction on the interplay between the business necessity defense, safety-related qualification standards and the direct threat test. The Act, while addressing in general terms the legal justification for qualification standards which screen out the disabled, does not address the specific question at issue in this case—whether a safety-based policy like Exxon's may be defended under the general business necessity standard set forth in § 12112(b)(6) and § 12113(a) without satisfying the direct threat test.[5]

---

**4.** In its response brief, Exxon cites several cases decided under the Rehabilitation Act and Title VII in support of its argument that it may defend its policy as a business necessity without meeting the direct threat test. However, these cases provide, little support for Exxon's position, because, as the company concedes, the precise question before this court has yet to be addressed by the courts. See Def.'s Resp. Br. filed Jan. 23, 1998 at 12–13. Moreover, a review of these cases reveals that many of them were decided before principles embodied in the Supreme Court case of *School Bd. of Nassau County v. Arline*, (480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987)), were incorporated into the Rehabilitation Act and the ADA. See, W. Robert Gray, *The Essential–Functions Limitation on the Civil Rights of People With Disabilities and John Rawls Concept of Social Justice*, 22 N.M. L.Rev. 295, 335–36 (1992). (tracing process whereby *Arline's* principles were codified in both the Rehabilitation Act and the ADA); see also discussion of *Arline*, infra at pgs. 643–644.

As to those cases cited which were decided post-*Arline*, the court finds them distinguishable in that they were either decided under Title VII, which contains no direct threat test, or turned on issues other than those presently before the court. See Def.'s Resp. Br. filed Jan. 23, 1998 at 12–13 n. 14 (citing *Chiari v. City of League City*,

920 F.2d 311, 316 (5th Cir.1991); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1113 (11th Cir. 1993); *Chandler v. City of Dallas*, 2 F.3d 1385, 1395 (5th Cir.1993); and *EEOC v. American Airlines*, 48 F.3d 164 (5th Cir.1995)).

**5.** Sections 12112 and 12113 of the ADA, which relate to qualification standards and the defenses applicable to those standards, provide in pertinent part:

§ 12112 Discrimination
(a) General rule
No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other tests conditions and privileges of employment. . . .
(b) Construction
As used in subsection (a) of this section, the term "discrimination" includes—. . . (6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities *unless the standard, test or other selection criteria, is used by the covered entity, is shown to be job-*

Because the ADA is silent with regard to the issue before the Court, the undersigned turns to the ADA's regulations for guidance to see first, if the regulations provide an answer and second, whether the answer is a proper one under the ADA.

## B. *The EEOC's Regulations*

When the statute itself is silent or ambiguous on an issue to which the agency's regulations provide an answer, the court must decide whether the agency's answer is based on a permissible construction of the statute. *Reich,* 110 F.3d at 1195 (citing *Perry,* 102 F.3d at 146). In construing the regulations, the court is mindful that, " '[t]he power of an administrative agency to administer a congressionally created... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' " *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782, (quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974)). "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782 (other citations omitted).

Turning, then, to the ADA's implementing regulations, the Court finds that they provide considerable guidance on the issue of the

related for the position in question and is consistent with business necessity ... 42 U.S.C. § 12112(b)(6) (emphasis added.)
Under the portion of the statute addressing defenses the ADA allows:
§ 12113 Defenses
(a) In general
It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, test, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.
(b) Qualification Standards
The term "qualification standards" may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the work place. 42 U.S.C. § 12113(a), (b).

permissible standard for the defense of safety-based qualification standards.

First, the regulations supply a definition of qualification standards, not provided in the Act, describing them as: "the skill, experience, education, physical, medical, *safety* and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q) (emphasis added). The regulations also reiterate the statutory proscription that employers may not discriminate by utilizing qualification standards that screen out or tend to screen out individuals with disabilities unless the standards are job-related and consistent with business necessity. 29 C.F.R. § 1630.10; see also 42 U.S.C.A. § 12112(b)(6); 42 U.S.C.A. § 12113. The EEOC's Interpretive Guidance to the ADA, set forth in the appendix to the regulations, interprets this broad proscription by advising that a qualification standard that is not related to an essential function of the job is not consistent with business necessity. 29 C.F.R. Part 1630 App. § 1630.10.[6] Perhaps most significantly, the appendix to regulations also informs that qualification standards justified by *safety* concerns are defensible as job-related and consistent with business necessity *only when the individual poses a direct threat to the health or safety of others.* 29 C.F.R. Part 1630 App. § 1630.15(b) & (c)(emphasis added).[7]

6. Section 1630.10 of the appendix to the EEOC's regulations specifically provides:
.... Selection criteria that exclude, or tend to exclude, an individual with a disability or a class of individuals with disabilities because of their disability but do not concern an essential function of the job would not be consistent with business necessity....
This provision is applicable to all types of selection criteria, including safety requirements, lifting requirements and employment tests. 29 C.F.R. Part 1630 App. § 1630.10.

7. The appendix specifically provides:
........With regard to safety requirements that screen out an individual with a disability or a class of individuals with disabilities, an employer must demonstrate that the requirement, as applied to the individual satisfies the "direct threat" standard in § 1630.2(r) *in order to show that the requirement is job-related and consistent with business necessity.* 29 C.F.R. § 1630.15(b) & (c)(emphasis added).

In sum, under the regulations, any type of qualification standard imposed by an employer must be tied to the performance of an essential function of the job in question to be consistent with business necessity. 29 C.F.R. Part 1630 App. § 1630.10. And with regard to the specific issue before the Court, the regulations counsel that if a qualification standard is safety-based that the employer must meet the direct threat test. 29 C.F.R. Part 1630 App. § 1630.15(b) & (c). In short, the regulations support the EEOC's view of the business necessity defense.

With the agency's answer to the issue at hand, the Court must now determine whether its construction of the statute is authorized under the Act. *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82. In deciding whether an agency's construction of a statute is permissible, the court should look to whether the agency's interpretation is reasonable "in light of the Act's text, legislative history and purpose." *Southern California Edison Company v. Federal Energy Regulatory Commission,* 116 F.3d 507, 511 (D.C.Cir.1997)(citing *Republican Nat'l Comm. v. FEC,* 76 F.3d 400, 406 (D.C.Cir. 1996)); see also *City of Cleveland, Ohio v. United States Nuclear Regulatory Commission,* 68 F.3d 1361, 1367–68 ((D.C.Cir.1995)(citing *Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783))("if agency's interpretation 'represents a reasonable accommodation .... we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' "). As will be set forth below, all of these considerations weigh in favor of finding that Exxon must meet the direct threat test to justify its policy as a business necessity.

### (1) The Statutory Scheme of the ADA

■ Looking first to the text of the ADA, the Court finds that general principles of statutory construction favor the EEOC's construction of the statute regarding the applicability of the direct threat standard to safety-based qualification standards. A basic rule of statutory construction is that the whole of the statute should be considered in ascertaining the meaning of language there-in. 2 A Sutherland, *Statutory Construction* § 46.05 (5th ed.1992). In attempting to determine the plain meaning of a statute, the court must look not only "to the particular statutory language at issue" but also to the language and design of the statute as a whole. *Perry,* 102 F.3d at 146 (other citations omitted). "It is a well-settled canon of statutory construction that the provisions of a unified statutory scheme should be read in harmony, leaving no provision inoperative or superfluous or redundant or contradictory." *Holley v. United States,* 124 F.3d 1462, 1468 (Fed.Cir.1997)(citing *Moskal v. United States,* 498 U.S. 103, 109–10, 111 S.Ct. 461, 465–66, 112 L.Ed.2d 449 (1990)); *Union Pacific Corp. v. United States,* 5 F.3d 523, 526 (Fed.Cir.1993). Statutory construction principles also direct that one provision of a statute "should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless." *Hughes Air Corp. v. Public Util. Com'n,* 644 F.2d 1334, 1338 (9th Cir.1981).

If, as Exxon argues, the ADA permits a defense of safety related policies short of the direct threat test, then the insertion of the direct threat requirement would seem to serve no purpose. It defies logic that an employer would choose to defend a safety-based policy under the direct threat test when it may utilize the less exacting business necessity standard to exclude an employee or group of employees who present safety hazards. *In other words, to permit Exxon's interpretation of the business necessity defense to stand would arguably render the direct threat test superfluous.* "[C]ourts should disfavor interpretations of statutes that render language superfluous." *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Thus, the text of the ADA interpreted in view of settled principles of statutory construction favors the agency's construction of the statute.

The ADA's legislative likewise supports this interpretation of the statute.

### (2) The ADA's Legislative History

Although the Supreme Court has expressed differing views on the import of leg-

islative history, *Shannon v. United States,* 512 U.S. 573, 583, 114 S.Ct. 2419, 2426, 129 L.Ed.2d 459 (1994), legislative history may provide guidance on whether an agency's construction of a statute is permissible. See *Strickland v. Commissioner, Maine Department of Human Services,* 48 F.3d 12, 17 n. 4 (1st Cir.1995)(courts may utilize legislative history to determine if the agency's interpretation is a permissible one); *City of Cleveland,* 68 F.3d at 1366 n. 4, 1368–68 (D.C.Cir. 1995); *Perry,* 102 F.3d at 149 (DeMoss, J., dissenting)(citing *Doyle v. Shalala,* 62 F.3d 740, 745 (5th Cir.1995))("In determining whether Congress has directly spoken to the issue, the court may consider not only the plain meaning of the statute, but also any pertinent legislative history.") With this in mind, the Court turns to the ADA's legislative history.

Of particular significance to this inquiry is the reliance in the House Committee Reports on the Supreme Court case of *School Board of Nassau County v. Arline;* [8] H.R.Rep. No. 485, 101st Cong., 2d Sess., (II), at 56–7 (1990) reprinted in 1990 U.S.C.C.A.N. at 338–39; H.R.Rep. No. 485, 101st Cong., 2d Sess., (III), at 34, 45 (1990) reprinted in 1990 U.S.C.C.A.N. at 445, 457, 468. *Arline* involved a school teacher who was fired after her third relapse with tuberculosis due to the "threat ...her relapses posed to the health of others." 480, U.S. at 281, 107 S.Ct. at 1128. The issues before the Supreme Court in *Arline* were two-fold. First, the high court analyzed whether an individual with a contagious disease fell within the definition of "handicapped person" under the Rehabilitation Act. Secondly, and of import to this analysis, the Court examined whether, in light of her potentially contagious condition, plaintiff was otherwise qualified for her job as an elementary school teacher.

On the first issue, the court found that her affliction with a contagious disease qualified her for inclusion as a "handicapped person" under the Rehabilitation Act. In so finding, the high court recognized the dangers of discrimination against a person with a contagious condition based upon "prejudiced attitudes or the ignorance of others." 480 U.S.

at 284–85, 107 S.Ct. at 1129–30. Focusing, secondly, on whether the teacher was "otherwise qualified" under the Act, the court recognized that a balance had to be struck between the protection of handicapped individuals from discrimination based upon prejudice, stereotypes or unfounded fear and an employer's interest in avoiding exposing others to significant health and safety risks. The court's resolution of these competing concerns was to find that only an individual who posed a "significant risk" of communicating an infectious disease to others, based on reasonable medical judgments, would fall outside the definition of an "otherwise qualified individual." 480 U.S. at 287–88 & n. 16, 107 S.Ct. at 1130–31 & n. 16.

In an effort to protect the disabled from this type of discrimination driven by stereotyping and mythology under the guise of health and safety standards, the House Committee Report adopted *Arline's,* "significant risk" standard:

A qualification standard may also include a requirement that an individual not pose a direct threat to the health or safety of other individuals in the workplace.......

In order to determine whether an individual poses a direct threat to the health and safety of other individuals in the workplace, the Committee intends to use the same standard as articulated by the Supreme Court in *School Board of Nassau County v. Arline.*

While the *Arline* case involved a contagious disease, tuberculosis, the reasoning in that case is applicable to other circumstances. A person with a disability must not be excluded, or found to be unqualified, based on stereotypes or fear. Nor may a decision be based on speculation about the risk of harm to others. Decisions are not permitted to be based on generalizations about the disability, but rather must be based on the facts of an individual's case. ...the purpose of creating the "direct threat" standards, is to eliminate exclusions which are not based on objective evidence about the individual involved.

8. 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987).

H.R.Rep. No. 485, 101st Cong., 2d Sess., (III), at 45 (1990), reprinted in 1990 U.S.C.C.A.N. at 468.

By adopting *Arline's* significant risk standard, this text from legislative history of the ADA manifests a clear Congressional intent to apply a stringent standard to safety-based qualification safety standards that tend to screen out the disabled based on speculative risks of harm. This, in turn, supports the position set forth in the EEOC's regulations that when an employer imposes qualification standards bearing on safety concerns, that the *Arline*-generated direct threat test provides the exclusive means of defense.

Other portions of the legislative history of the ADA suggest that it is safety-based qualification standards as opposed to other types of qualification standards that are most susceptible to employer speculation and stereotyping and, thus, most in need of exacting review. For example, in addressing qualification standards in general, the House Report contains the following statement:

> Under this [ADA] legislation, an employer may still devise physical and other job criteria and tests for a job so long as the criteria or tests are job-related and *consistent with business necessity.* Thus for example, an employer can adopt a physical criterion that an applicant be able to lift 50 pounds, *if that ability is necessary to an individual's ability to perform the essential functions of the job in question.* Or, for example, security concerns may constitute valid job criteria. For example, jewelry stores often employ security officers because of the frequency of "snatch and run" thefts. Mobility and dexterity may be essential job criteria functions in such jobs. . . .

> It is also acceptable to deny employment to an applicant or to fire an employee with a disability on the basis that the individual poses a direct threat to the health or safety of others or poses a direct threat to property. H.R.Rep. No. 485, 101st Cong., 2d Sess., (II), at 56 (1990) reprinted in 1990 U.S.C.C.A.N. 303 (emphasis added).

The House Report advises that job criteria tied to concrete functions of the job—mobili-

ty and dexterity for jewelry store security officers are consistent with business necessity if the ability to perform such tasks is necessary to carry out the essential functions of the job. As compared to safety-based qualification standards, determining business necessity under these circumstances appears to be a much more straightforward undertaking because the qualification standard is directly tied to the tasks necessary to do the job. Safety-based qualification standards, on the other hand, are not directly tied to the performance of a concrete function of the job, rather, they are based upon concerns about the *safe* performance of the essential functions of the job. Because these standards are not directly measured against the tasks necessary to complete the job, they are particularly susceptible to employer speculation and stereotyping precisely what the authors of the ADA's legislative history through the adoption of *Arline* sought to prevent. In other words, because safety-based qualification standards are, by their nature, more susceptible to employer speculation than qualification standards directly tied to the essential functions of the job, the direct threat test appears the appropriate standard by which carry out the principles embodied in the legislative history and *Arline.*

In sum, the legislative history of the ADA, by adopting *Arline* and through its discussion of qualification standards in general, supports a finding that the EEOC's construction of the statute is firmly rooted in its legislative history. And as will be discussed below, the purpose behind the ADA's enactment also furthers this interpretation of the statute.

### (3) ADA's Purpose

In determining the purpose behind the creation of the ADA, one need only look to the statute itself. Section 12101(b) of the Act lists its statutory aims. 42 U.S.C.A. § 12101(b). Among the ADA's goals, is to "provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C.A. § 12101(b)(2). As the driving force behind its stated objectives, the ADA sets out a litany of Congressional findings on the plight

of the disabled in America. Included in the findings is a recognition that the disabled have historically been subjected to stereotypical assumptions and prejudice. § 12101(a)(7) & (9).

With the foregoing statutory goals and findings as a backdrop, the undersigned finds again that the EEOC's view of safety standards, as set forth in its regulations, constitutes a reasonable interpretation of the Act. Limiting the defense of safety-based qualification standards to the direct threat test is consistent with the aim of the Act to prevent stereotyping and prejudice against the disabled. In sum, because the purpose of the ADA is furthered by the EEOC's construction of the statute regarding safety standards, the Court finds an additional basis upon which to find that the EEOC's view of the ADA is a permissible one.

### C. Business Necessity Defense–Conclusion

 In conclusion, despite the lack of case authority or explicit guidance in the ADA itself, the Court finds that Exxon's business necessity defense is subject to the direct threat standard. As stated above, the statutory scheme of the ADA, its legislative history and stated purpose support a finding that safety-based qualification standards which screen out the disabled can only be justified by meeting the direct threat test. Consequently, Exxon's reliance on potential civil and criminal liability, concerns about the environment and its corporate citizenship will not suffice to justify its policy as a business necessity.[9] Accordingly, this Court recommends that the EEOC's motion for summary judgment be granted in favor of the EEOC as to Exxon's affirmative defenses set forth in paragraphs 14 and 15 of its First Amended Answer to the extent those paragraphs rely on factors other than the direct threat standard.

### 2. Equitable Defenses

The EEOC next seeks to bar Exxon from asserting its equitable defenses of judicial estoppel,[10] unclean hands and ratifica-

9. In so finding the court is mindful of some discussion in the case authority suggesting that tort liability may support a business necessity defense. See *Zuniga v. Kleberg County Hosp.*, 692 F.2d 986, 992 n. 10 (5th Cir.1982)(a Title VII case in which the court noted in dicta that avoiding the economic disruption accompanying tort litigation may arguably constitute business necessity). In the Supreme Court case of *International Union v. Johnson Controls, Inc.*, the issue of tort liability as a defense was discussed in the context of whether compliance with Title VII preempted state tort liability. However, the majority ultimately determined that it was unnecessary to address the preemption issue, stating "[b]ecause *Johnson Controls* has not argued that it faces any costs from tort liability, not to mention crippling ones, the preemption question is not before us." 499 U.S. 187, 210, 111 S.Ct. 1196, 1209, 113 L.Ed.2d 158 (1991). In concurring in part, Justice White went a bit further stating that a fetal-protection policy, such as the defendant's, could be justified under Title VII if an employer could establish that it was "reasonably necessary to avoid substantial tort liability." 499 U.S. at 212, 111 S.Ct. at 1210. (*White, J.* concurring in part, and concurring in the judgment).

Exxon cites *Johnson* and several other cases to support an argument that tort liability may serve as a defense to its policy. Def.'s Resp.Br. filed Jan. 23, 1998 at 15, 16 & n. 18. However, none of these cases support its argument because they do not address the precise issue in this case. Moreover, many courts have rejected tort liabili-

ty as a defense because "potential liability is too contingent and too broad a factor to amount to a 'business necessity.'" *Hayes v. Shelby Mem. Hosp.*, 726 F.2d 1543, 1553–54 n. 15(11th Cir. 1984); *Toledo v. Nobel–Sysco, Inc.*, 892 F.2d 1481, 1492 (10th Cir.1989), cert. denied, 495 U.S. 948, 110 S.Ct. 2208, 109 L.Ed.2d 535 (1990); See also David L. LaPorte, *The Conflict and Interaction of the Americans' with Disabilities Act With the Omnibus Transportation Employee Testing Act: Two Modest Proposals to Achieve Greater Synchrony*, 45 DePaul L.Rev. 537, 595–600 (1996) (addressing the viability of a tort liability defense under the ADA and noting that courts entertaining this argument in other employment discrimination contexts have been "unsympathetic."). In short, while the courts may ultimately endorse tort liability as a defense to some forms of discrimination, based on their general reluctance to do so thus far, this court declines Exxon's invitation to engraft such a defense onto the ADA under the circumstances of this case.

10. In both its motion to strike and its supplemental brief in support of its motion to strike, the EEOC argues that Exxon is unable to satisfy the requirements for an equitable estoppel defense as set forth in *Heckler v. Community Health Servs.*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Pl.'s Supp. Br. at 12–21. Exxon's response brief filed January 23, 1998 and its argument at the hearing before the undersigned on January 30, 1998, however, established that its

tion.[11] The Court turns first to Exxon's judicial estoppel defense.

## A. Judicial Estoppel

The EEOC takes issue with Exxon's judicial estoppel defense contending that it would be inappropriate to apply judicial estoppel in this case because if Exxon prevails on that defense, the EEOC will be estopped from enforcing the ADA as Congress intended. The EEOC argues that the effect of applying judicial estoppel to the Government in this case would be to grant Exxon a "perpetual license to violate the ADA." Pl.'s Reply at 7. Further, the EEOC asserts that the case authority demonstrates that it is rarely appropriate to apply estoppel doctrines to the government. Before addressing the merits of this argument, the general principles of judicial estoppel must be reviewed.

■ Judicial estoppel is a common law doctrine by which a party may be estopped from asserting a position in a legal proceeding that is inconsistent with a position previously taken in the same or an earlier proceeding. *Ergo Science, Inc., v. Martin*, 73 F.3d 595, 598 (5th Cir.1996). The judicial estoppel doctrine's purpose is to "to prevent parties from playing fast and loose with the courts to suit the exigencies of self interest." *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir.1988) (citation omitted). Judicial estoppel serves a different purpose than equitable estoppel and therefore, at least one Circuit has held, in some cases, "may apply against the Government when equitable estoppel would not." *United States v. Owens*, 54 F.3d 271, 275 (6th Cir.), *cert. dismissed*, 516 U.S. 983, 116 S.Ct. 492, 133 L.Ed.2d 418 (1995). However, as is the case with equitable estoppel, courts construe the doctrine of

judicial estoppel narrowly when applied against the Government. *Id.*

■ Although the United States Supreme Court has never applied estoppel against the Government, it has declined to adopt an absolute rule that estoppel may never run against the Government. *Office of Personnel Management v. Richmond*, 496 U.S. 414, 423, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). However, to date, the Supreme Court has reversed every case it has reviewed in which a federal court of appeals has applied estoppel against the Government. *Id.*, at 422, 110 S.Ct. at 2470. The Supreme Court has explained that it is seldom appropriate to apply estoppel doctrines to the Government because

> [w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant.

*Heckler*, 467 U.S. at 60, 104 S.Ct. at 2224.[12] Thus, as a general rule, courts are "very reluctant to apply estoppel doctrines against the Government." *Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 473 (6th Cir.1988).

There is scant Fifth Circuit authority on the issue of whether or not the judicial estoppel doctrine may be applied against the Government. Further, the two Fifth Circuit cases that have addressed whether judicial estoppel could apply against the Government are not instructive because they involve criminal prosecutions. *See Nichols v. Scott*, 69 F.3d 1255, 1272 (5th Cir.1995), *cert. denied*,

estoppel defense is based upon the principles of judicial estoppel and not on the elements of traditional equitable estoppel addressed in *Heckler*. Def.'s Resp. Br. at 22–23. With this in mind, the court will restrict its analysis regarding estoppel to Exxon's judicial estoppel defense.

11. In paragraphs 25 and 26 of its First Amended Answer, Exxon asserts the defenses of estoppel, ratification and unclean hands. Paragraph 25 sets forth the facts upon which these defenses are based. Paragraph 26 specifically pleads these theories of defense.

12. Although the Supreme Court decisions cited above have involved equitable estoppel, and judicial estoppel is at issue here, the court finds that the reasons behind the high court's reluctance to estop the Government are equally applicable in cases involving judicial estoppel. See *United States v. Owens*, 54 F.3d 271, 274 (6th Cir.) *cert dismissed*, 516 U.S. 983, 116 S.Ct. 492, 133 L.Ed.2d 418 (1995)(a case involving judicial estoppel in which the court cited *Heckler*, for the rule that estoppel is to be applied narrowly against the Government).

518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996) (observing that judicial estoppel has never been applied against the government in a criminal case); *See also United States v. McCaskey,* 9 F.3d 368, 378 (5th Cir.1993), *cert. denied,* 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994) (same).

In contrast to the Fifth Circuit, the Sixth Circuit has previously been confronted with the issue of whether the judicial estoppel doctrine may be applied against the Government. In *Reynolds,* the IRS had previously obtained a court-approved compromise that required a taxpayer's spouse to pay taxes on a capital gain resulting from the sale of a leasehold interest and mineral rights in the taxpayer's coal mine. Nevertheless, in a later proceeding, the IRS sought to require the taxpayer to pay taxes on the same capital gain. *Reynolds,* 861 F.2d at 472. The *Reynolds* court acknowledged that it is seldom appropriate to apply estoppel doctrines against the government, but nevertheless concluded that the IRS was judicially estopped from taxing the gain to the taxpayer. *Id,* at 474. In so holding, the court explained that

> [w]hat we have in the case before us, however, appears to be a knowing assault upon the integrity of the judicial system. There has been no claim here that the IRS was not fully conversant with all of the pertinent facts at the time of the stipulation with [the taxpayer's spouse], and we can perceive no reason why the IRS should be allowed knowingly to take a position in one judicial proceeding, secure final judicial acceptance of that position, and then knowingly attempt to persuade a different court to accept a fundamentally inconsistent position. *Id.*

However, even though the Sixth Circuit applied judicial estoppel against the Government in *Reynolds,* subsequent decisions make it clear that the circumstances in *Reynolds* are the exception, rather than the rule. *Owens,* 54 F.3d at 274 ("the rule of judicial estoppel, even when invoked, should be construed narrowly against the government for the policy reasons stated in Heckler").

With the foregoing case authority as a guide, the Court turns to the facts underlying Exxon's judicial estoppel defense.

In support of its judicial estoppel defense, Exxon attaches several exhibits to support its contention that the EEOC's current position is inconsistent with the position of the Government in the VALDEZ litigation. First, Exxon submits a letter authored by Charles A. De Monaco, a Government official who signed the indictment against Exxon, in which Mr. De Monaco highlights the factual basis for the Government's allegation that Exxon was criminally negligent. Specifically, Mr. De Monaco claimed that Exxon failed "to exercise due care by promulgating and implementing policies that permitted employees suffering from alcohol abuse problems to hold safety-sensitive positions." Def.'s Resp. Br. filed Jan. 23, 1998, Ex. J, at 2.

Secondly, Exxon argues that the position taken by the Government in the VALDEZ litigation, as set forth in the Bill of Particulars filed in connection with the criminal charges brought against Exxon, is inconsistent with the Government's current position. Specifically, in its Bill of Particulars, the Government claimed that those employees "who were responsible for formulating and implementing policies regarding employee alcohol abuse for Exxon USA and its affiliates from 1985 through March 24, 1989," were criminally negligent. Id., Ex. K at 19.

Third, Exxon claims that the Government previously expressed its approval of its existing substance abuse policy in the Government's Memorandum in Aid of Sentencing from the VALDEZ litigation. Def.'s Resp. Br. at 25. The Memorandum in Aid of Sentencing provides as follows:

> The last factor the court should consider in determining the amount of the fine is any measures taken by the defendants to prevent a recurrence of the offense. Since the grounding, Exxon Corporation has revised its substance abuse policy considerably. Specifically, employees who have had or are found to have a substance abuse problem will not be permitted to work in safety sensitive positions and employees who have returned from rehabilitation will

be required to participate in an aftercare program.

Id., Ex. L, at 10.

Exxon further contends that the expert witness reports filed by Stuart Gerson and Richard Stewart, two attorneys involved in the Government's prosecution of the VALDEZ litigation, establish that Exxon's adoption of the 1989 substance abuse policy was a significant factor in the Government's decision to settle the civil and criminal prosecutions arising out of the VALDEZ incident. Id., Ex. B, at 8; Ex. Q, at 2. Lastly, Exxon submits the deposition testimony of Lee Raymond, the Chief Executive Officer of Exxon. In his deposition, Raymond testified that shortly after the VALDEZ incident, Exxon was told by both an employee of the Department of Justice and Samuel Skinner [13] that Exxon's previous policy was flawed in that it permitted substance abusers and recovered substance abusers to work at the helm of the VALDEZ. Id., Ex. E, at 47–50.

Based on the foregoing exhibits, Exxon argues that in the VALDEZ litigation, the Government asserted that Exxon was criminally negligent for promulgating and maintaining a substance abuse policy that permitted substance abusers to hold safety sensitive positions. Exxon further contends that the Government approved of Exxon's 1989 substance abuse policy, which revised the prior policy, and recommended that Exxon's criminal penalties be reduced because of the adoption of the 1989 policy. According to Exxon, in the instant case, the position of the EEOC is inconsistent with the government's position in the VALDEZ litigation because the EEOC is now challenging the 1989 policy under the ADA on the grounds that it excludes recovered substance abusers from safety sensitive positions.

Having reviewed the foregoing facts underlying Exxon's affirmative defense of judicial estoppel, the Court finds, even accepting Exxon's version of events as true, that its estoppel defense is deficient as a matter of law. Unlike the situation presented in *Reynolds, supra* the instant case does not involve a "knowing assault on the integrity of the

judicial system" in which the Government is playing "fast and loose with the courts." Stated another way, this case does not present a situation where the Government is taking inconsistent positions to suit its self interests. However forceful a stance the Government took on Exxon's policy during the VALDEZ litigation, it was the enactment of the ADA and not the exigencies of self interest that caused it to take a second look at Exxon's 1989 policy. See *Owens,* 54 F.3d at 274. ("[T]he government should not be unduly hindered from changing its position if that shift is the result of a change in public policy."). Exxon does not contend that the Government took the position during the VALDEZ litigation that its policy complied with the ADA. Indeed, such an inconsistent position would surely render this ADA action suspect under judicial estoppel principles. However, during the VALDEZ proceedings, it would have been impossible for the Government to have taken any position concerning the ADA because the ADA had not yet been enacted. Once Congress enacted the ADA, it became incumbent upon the EEOC to prosecute violations of the ADA. See 29 C.F.R. Part 1630 App. (1997)("The [EEOC] is responsible for enforcement of [the ADA]").

While the enactment of the ADA after the VALDEZ prosecution has undeniably placed Exxon in a difficult situation, Exxon's plight does not warrant estopping the EEOC from prosecuting this ADA suit. For the reasons stated above, such a finding is not supported by the relevant authority. Moreover, such a holding would necessarily imply that during the VALDEZ litigation, Exxon's 1989 substance abuse policy was granted a prospective exemption from compliance with statutes that had yet to be enacted. The very narrow grounds upon which the courts have estopped the Government, do not support such a drastic measure under the facts of this case. This is particularly so where such a ruling would preclude the Government from enforcing a statute. See *Heckler,* 467 U.S. at 60, 104 S.Ct. at 2224. Accordingly, it is recommended that summary judgment be granted in favor of the EEOC as to Exxon's

13. Samuel Skinner was the Secretary of Transportation at the time of the VALDEZ incident.

affirmative defense set forth in paragraphs 25 and 26 of its First Amended Answer to the extent that those paragraphs rely upon the doctrine of judicial estoppel.

## B. *Unclean Hands and Ratification*

The EEOC also seeks to prevent Exxon from presenting its defenses of unclean hands and ratification. With regard to Exxon's unclean hands defense, specifically set forth in paragraph 26 of its First Amended Answer, the EEOC's states simply that "Exxon has not and cannot prove any fraudulent or dishonest conduct on the part of the Government rendering its hands unclean." Pl.'s Supp. Br. at 11. These conclusory assertions by the EEOC are not sufficient to establish that they are entitled to summary judgment under Fed.R.Civ.P. 56. Exxon's ratification theory is also pled in paragraph 26 of Exxon's First Amended Answer. However, other than to state its challenge to this theory of defense, the EEOC has failed to provide the Court with any legal basis upon which this defense should be subject to summary judgment. Consequently, the EEOC's motion for summary judgment on the unclean hands and ratification defenses must be denied.

## *3. BFOQ*

 Finally, the EEOC challenges Exxon's affirmative defense that its policy is "an implementation of a bona fide occupational qualification." Pl.'s Supp. Br. at 10; Def.'s First Amended Answer at ¶ 24. The EEOC takes issue with this defense because, it argues, the ADA does not contain the defense of bona fide occupational qualification ("BFOQ").

Both Title VII and the Age and Discrimination Employment Act of 1967 ("ADEA") contain BFOQ provisions. 42 U.S.C.A. § 2000e–2(e)(1); 29 U.S.C.A. § 623(f)(1); see also *Johnson Controls,* 499 U.S. at 201, 111 S.Ct. at 1204 (other citations omitted). Under these statutes, the BFOQ provisions permit an employer to discriminate on the basis of "religion, sex, or national origin [or age] in those certain instances where religion, sex, or national origin [or age] is a bona fide occupational qualification reasonably neces-

sary to the normal operation of that particular business or enterprise," 42 U.S.C.A. § 2000e–2(e)(1); 29 U.S.C.A. § 623(f)(1) The BFOQ provisions of these statutes are narrowly drawn and sparingly applied defenses. *Johnson Controls,* 499 U.S. at 200–201, 111 S.Ct. at 1204.

As contrasted with Title VII and the ADEA, the ADA does not contain a BFOQ defense. In urging this defense, Exxon relies upon language used by the undersigned in previous findings suggesting the permissibility of a "BFOQ-type impossibility defense under the ADA". Def.'s Resp. Br. at 18 citing Recommendation of the U.S. Magistrate Judge, dated November 18, 1996, at 67. While this Court did suggest the plausibility of a BFOQ-type defense under the ADA, it was in the context of a discussion on the validity of Exxon's blanket policy and whether or not Exxon's failure to conduct individualized assessments rendered their policy *per se* unlawful under the ADA. See Recommendation of the U.S. Magistrate Judge dated November 18, 1996, at 67.

In finding that Exxon's policy was not *per se* invalid, this Court relied, in part, on cases under Title VII and the ADEA in which, under the BFOQ provisions of those statutes, blanket policies were found permissible. Id. at 56–67. This Court also relied on cases permitting blanket policies decided under the Rehabilitation Act which contains no BFOQ provision. Id. at 60–61. The Court did not recommend that a BFOQ defense be incorporated into the ADA. Rather, it was the reasoning upon which the courts had relied in the past—under BFOQ and non-BFOQ statutes alike—to uphold blanket policies, that was the focus of the analysis. Based, in part, on these cases, this court found that Exxon's policy was not facially invalid and that the company should be permitted to establish that it was "impossible or impractical" to individually assess each safety-sensitive job applicant. Id at 64–72. The District Court later adopted this portion of the undersigned's findings. See Mem. Opinion, and Order filed July 1, 1997 at 8–12.

In sum, the ADA contains no BFOQ provision. Under this Court's and the District Court's previous holdings, Exxon is, however,

permitted to attempt to establish that it is impossible or impractical to individually assess individual affected by its policy. To the extent that this defense resembles a BFOQ defense, it is not subject to summary judgment for the reasons stated in this court's and the District Court's previous opinions. However, in all other respects, Exxon's attempt to assert a BFOQ defense under the ADA fails and summary judgment must be granted. Accordingly, to the extent Exxon seeks to assert a BFOQ defense beyond what has been permitted by the District Court with regard to its impossibility defense, this Court recommends that summary judgment be granted as to its defense set forth in paragraph 24 of its First Amended Answer.

*Conclusion*

In conclusion, this Court recommends that the Plaintiff's Motion to Strike the Defendant's Affirmative Defenses, filed October 15, 1997, and the Plaintiff EEOC's Supplemental Brief in Support of its Motion to Strike Defendant's Affirmative Defenses, filed January 8, 1998, be **GRANTED** in part, and **DENIED** in part, as follows:

It is **RECOMMENDED** that summary judgment be granted as to Exxon's affirmative defense of business necessity, set forth in paragraphs 14 and 15 of its First Amended Answer, to the extent those paragraphs rely on factors other than the direct threat standard.

It is further **RECOMMENDED** that summary judgment be granted as to Exxon's affirmative defense of judicial estoppel as set forth in paragraphs 25 and 26 of its First Amended Answer. As to Exxon's affirmative defenses of unclean hands and ratification set forth in paragraphs 25 and 26 of its First Amended Answer, it is **RECOMMENDED** that summary judgment be denied.

It is further **RECOMMENDED** that summary judgment be granted on Exxon's affirmative defense that its policy is justified as a Exxon's BFOQ as set forth in paragraph 24 of its First Amended Answer.

So Recommended,